1IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK 25-80501 |
| | ) | |
| JAYME DAVIS SELL and ANDRA LYNNE SELL, | ) ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | _____ |
| | ) | |
| CHRISTINA D'SAACHS, | ) | Case No. AP 25-08010 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JAYME DAVIS SELL and ANDRA LYNNE SELL, | ) ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Motion for Summary Judgment**

This matter is before the court on the defendants' motion for summary judgment (Doc. #19). The plaintiff, Christina D'Saachs, filed a complaint seeking to except a debt owed by debtor Jayme Sell from discharge under 11 U.S.C. § 523(a)(2)(A) and to deny both defendants' discharge under 11 U.S.C. § 727(a)(4)(A). The motion is denied because genuine issues of material fact exist making summary judgment improper.

**Findings of Fact**

The plaintiff and Mr. Sell began dating after they met at a pool tournament in Arizona in 2021. When they met Mr. Sell owed a significant amount of high interest debt which he was trying to consolidate. His first consolidation effort occurred in April 2022. On April 15, Mr. Sell borrowed $25,000 at 21% for 84 months. He used the money to pay off two credit cards and one of two significant loans. He texted the news to the plaintiff, adding, "And still have $8,000". Mr. Sell texted his plan to apply for a $60,000 consolidation loan in the next 90 days. The plaintiff asked:

> Why do you need to borrow $60 now?
>
> It's not making sense why you need so much money.

Mr. Sell responded:

> I'm just trying to consolidate everything into 1 payment to allow me to make double payments and literally be debt free

It does not appear Mr. Sell applied for or obtained another consolidation loan. He moved home to Nebraska on June 6, 2022, and the romantic relationship ended. On July 20, 2022, Mr. Sell texted the plaintiff a screen shot of an image depicting a credit score of 777. He followed it with:

> Man I wished your house could pull equity out and I paid you $1,000 per month for 55 months

The plaintiff's response to the text is not in evidence. Over one month later, on August 31, 2022, Mr. Sell sent the plaintiff a picture of his pay advice showing he earned $22.47 per hour plus overtime. He commented:

> Like I said, I'll be able to pay you back with ease

In several texts the plaintiff questioned Mr. Sell's fiscal responsibility. Nevertheless, the plaintiff agreed to lend Mr. Sell at least $55,000 in September 2022. Mr. Sell contends the plaintiff offered the money. The plaintiff contends Mr. Sell requested it.

The plaintiff drafted a loan agreement, which both parties signed. The agreement states the loan is "for the purposes of repaying three personal loans / debts". The three loans are listed. They include debts to two private lenders plus a $4,600 "Personal Loan". The agreement does not contain an interest rate, but it includes a "closing cost amount" of $8,000, and a $5,000 breakup penalty if the parties "have a falling out". The agreement lists potential collateral. Mr. Sell agreed to "sign over title for his truck as soon as it is paid off and will be held for collateral." Mr. Sell never granted the

plaintiff a lien against the truck. According to Mr. Sell, the truck was totaled in a collision, and the proceeds were paid to the secured lender.

In the loan agreement Mr. Sell agreed to pay through wage withholding. The wage withholding did not last long. He was laid off from his job in February 2023. The parties dispute whether Mr. Sell made payments other than through the employer.

In January 2023, one month before he was laid off, Mr. Sell applied for and obtained a $20,000 loan from SoFi Bank at an interest rate of 18.01%. He did not inform the plaintiff. According to the plaintiff she would not have loaned Mr. Sell any money had she known he would borrow $20,000 from another lender. According to Mr. Sell, when he borrowed money from the plaintiff, he did not intend to borrow $20,000 from another lender. The loan became necessary because Mr. Sell was accused of assault. Mr. Sell needed the money to pay a retainer to a defense attorney, though it is not clear when the accusation arose or whether he paid the attorney the entire $20,000.

Mr. Sell's indebtedness to the plaintiff grew. According to texts from the plaintiff, Mr. Sell withdrew money from the plaintiff's bank account without authorization. On October 19, 2023, they texted each other:

> Why do you keep withdrawing money from the Chase account. Over four hundred dollars since yesterday. You have literally lost your mind

> No ma'ma I'm putting it all back in 3 weeks

The debtors characterize the money withdrawn from the Chase account as a loan. The plaintiff texted four days later, on October 23, 2023, a copy of an amended loan agreement adding the Chase withdrawals:

> I emailed you an updated contract that has the breakout of what was loaned and it also notes the money you have borrowed since you were laid off. Please sign it if you can. Or at minimum respond to the email agreeing.

The amended loan agreement refers to the money removed from the Chase account as: "Amount borrowed using Chase Acct -$8,000". Mr. Sell never signed the amended agreement.

The plaintiff continued to lend Mr. Sell money. The plaintiff drafted a second revised loan agreement, which Mr. Sell signed. It is dated January 2, 2024, and includes the $8,000 Chase amounts. It also includes an additional "Amount borrowed to avoid repossession of the truck January 2024 - $1629".

Mr. Sell married Andra sometime after he returned to Nebraska. Mrs. Sell also texted the plaintiff. In February 2024, she texted, "I don't know why you were helping him in the first place he was just using you it was easier that way". Mrs. Sell dismissed the statement, testifying, "I was trying to upset her. I was upset. I was just wanting her to stop contacting him all the time. His plans were to pay her back."

With no significant payment on the debt, the plaintiff sued Mr. Sell in August 2024. She obtained a judgment and garnished Mr. Sell's wages. Mr. Sell requested, via text message, the plaintiff release the garnishment. She refused. Mr. Sell texted he was filing for bankruptcy and again requested she release the garnishment. The plaintiff asked:

> How can I trust that you will pay me?

Mr. Sell pressed for a release, texting at various times:

> The bankruptcy is paying it
>
> [T]his bankruptcy will pay all of it.
>
> I'm just asking if it could stop the garnishment while the bankruptcy starts

The conversation continued. The truncated version:

> I need to know if the bankruptcy doesn't pay it then you will pay it
>
> That is a 100% done deal that it will be paid off by the bankruptcy minus what has already been sent.

Now I am asking for your word to take responsibility … and confirm that either bankruptcy will pay it or you will make sure its paid

Yes that is 100% true that the money owed will be take care of by the bankruptcy

And if the bankruptcy doesn't pay you will find another way to pay?

That's the fastest way was the bankruptcy. But yes

During the 341 meeting of creditors the plaintiff's counsel asked Mr. Sell about his statements regarding the effect of bankruptcy. She characterizes his equivocal response as a false oath.

The debtors filed their bankruptcy case on May 23, 2025. In their schedules they did not disclose receiving $1,600 in rental assistance. The plaintiff asked about assistance during a Rule 2004 examination. The debtors admitted they received the assistance and subsequently amended their bankruptcy schedules. Amended Schedule I now states, "Debtors have received rental assistance since December of 2024. Debtors anticipate paying rent in September 2025." Even with the rental assistance, the debtors earn under median income for a family of four.

### Summary Judgment Standard

Under the Federal Rules of Civil Procedure, "A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.

If a moving party meets its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The nonmoving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Grant v. City of Blytheville*, 841 F.3d 767, 770 (8th Cir. 2016) (cleaned up).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). In making this determination, a court must not "make credibility determinations, or attempt to discern the truth of any factual issue". *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021); *see also Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) ("[S]ummary judgment is improper where specific facts 'even partially' undermine the witness's credibility in a material way.")

## Conclusions of Law

The plaintiff seeks to except the judgment debt from the scope of Mr. Sell's discharge, and to deny both debtors a discharge. The bankruptcy discharge is the vehicle through which the Bankruptcy Code gives honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The Code contains multiple exceptions to the discharge. These exceptions are "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Willmar Elec. Servs. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018) (citing *Community Fin. Grp. v. Fields (In re Fields)*, 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014)).

The plaintiff's claims are predicated on fraud. To prevail on either claim the plaintiff must prove fraudulent intent. Establishing intent does not require proof of "malevolence or personal ill-will". *AGP Grain Coop. v. White (In re White)*, 315 B.R. 741, 748 (Bankr. D. Neb. 2004). Direct proof of intent is often impossible to obtain. Therefore, a party "may present evidence of the surrounding circumstances from which intent may be inferred." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815 (B.A.P. 8th Cir. 2011). Circumstances include various "badges of fraud". *See First Neb. Bank v. Balfour (In re Balfour)*, 2020 WL 412184, at *9 (Bankr. D. Neb. Jan. 24, 2020) (providing a non-exclusive list of badges of fraud). Fraudulent intent may be 'inferred from the facts and circumstances of the debtor's conduct.'" *U.S. Trustee v. Beard (In re Beard)*, 595 B.R. 274, 295 (Bankr. E.D. Ark. 2018). Moreover, the cumulative effect of falsehoods evidencing a "pattern of reckless and cavalier disregard for the truth" may support a finding of fraudulent intent. *Id.*

*Exception to Dischargeability under § 523(a)(2)(A)*

Section 523 contains several exceptions to discharge. The plaintiff asserts her judgment is excepted under 11 U.S.C. § 523(a)(2)(A). Under § 523(a)(2)(A) a

debtor is not discharged from a debt "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The plaintiff has the burden to prove each element of a claim under § 523 by a preponderance of the evidence. *Willmar Elec. Servs.*, 592 B.R. at 349.

The three grounds under § 523(a)(2)(A) are not identical. The first, a false pretense, involves an "implied misrepresentation or conduct intended to create and foster a false impression." *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). The second, false representation, requires the plaintiff establish:

> (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*Willmar Elec. Servs.*, 592 B.R. at 349. The third is actual fraud.

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid*. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

Despite the claim containing three grounds, Mr. Sell focuses only on fraudulent representation. He attacks three elements of the plaintiff's claim for fraudulent representation – a representation, justifiable reliance, and intent to deceive.

For his first attack, Mr. Sell argues "at the time the contract was executed" he did not make a false representation. The plaintiff counters, pointing to the text message from April 2022 where Mr. Sell states his goal to "literally be debt free." She asserts he "repeatedly" expressed the same desire. She asserts Mr. Sell represented he would use the loaned funds to eliminate his debts. With his debts eliminated, he could repay her.

Mr. Sell next argues the plaintiff "produced no evidence establishing that [she] actually or justifiably relied on any alleged misrepresentation by the Debtor." Mr. Sell is correct insofar as he states the plaintiff has the burden of proof at trial. But this is a motion for summary judgment. In moving for summary judgment, he has the burden to prove absence of a genuine dispute. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. For her response, the plaintiff states in an affidavit she did rely. She questioned Mr. Sell's financial responsibility. But she ultimately relented, loaning Mr. Sell money after Mr. Sell texted his goals and buttressed his own creditworthiness.

Mr. Sell's final attack gets to what appears to be the most germane issue regarding plaintiff's claim – Mr. Sell's intent. Mr. Sell argues his intent was pure because he repaid the loan from June 2022 through February 2023 and made additional payments after he lost his job. The plaintiff argues the contrary. Mr. Sell did not stay debt free. He promptly borrowed $20,000 in February 2023. He did not disclose the $20,000 loan. She asserts payments were not "voluntary" because Mr. Sell's employer paid them. She asserts Mr. Sell pilfered her accounts and "convinced" her to lend additional money. She concludes with "For these and other reasons" material facts are in dispute.

Mr. Sell's intent remains a genuine issue of material fact and is largely a credibility issue. Did Mr. Sell intend to repay the plaintiff? Was Mr. Sell "using" the plaintiff in a scheme to get money? These unresolved issues preclude summary judgment because "[a] material promise to perform in the future made with the intent to defraud and without the intent to perform . . . constitutes actionable fraud." *R & R Ready Mix v. Freier (In re Freier)*, 604 F.3d 583, 588 (8th Cir. 2010) (cleaned up); *see also Husky Int'l Elecs., Inc.*, 578 U.S. at 360 ("[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'").

The plaintiff pled all three parts of § 523(a)(2)(A) – fraudulent representation, false pretense, and actual fraud. Even if Mr. Sell was entitled to summary judgment regarding the fraudulent representation part of 11 U.S.C. § 523(a)(2)(A), genuine issues of material fact exist on the other parts. Because the overall claim under § 523(a)(2)(A) remains, resolution of the narrow issue of the viability of a claim for fraudulent representation is best left for trial.

### Denial of Discharge under § 727(a)(4)(A)

The plaintiff's second claim is the debtors made a false oath or account under 11 U.S.C. § 727(a)(4)(A). The plaintiff asserts two falsities. First, the debtors did not account for rental assistance in their schedules. Second, Mr. Sell

made inaccurate pre-petition statements about the dischargeability of the plaintiff's claim.

The bankruptcy system "depends upon the debtor providing complete, accurate and reliable information in the petition and other documents submitted with the petition so that parties in interest may evaluate a debtor's assets and liabilities and appropriately administer the case." *Horizon Fin. Bank v. Borstad (In re Borstad)*, 550 B.R. 803, 833 (Bankr. D.N.D. 2016); *see also Home Serv. Oil Co. v. Cecil (In re Cecil)*, 542 B.R. 447, 454 (B.A.P. 8th Cir. 2015) ("Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]").

> [T]he Bankruptcy Code requires disclosure of all interests in property, the location of all assets, prior and ongoing business and personal transactions, and, foremost, honesty. The failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole.

*National Am. Ins. Co. v. Guajardo (In re Guajardo)*, 215 B.R. 739, 742 (Bankr. W.D. Ark.1997). A debtor's bankruptcy petition, and the accompanying schedules, and statements, "must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." *Korte v. United States (In re Korte)*, 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (cleaned up).

> Section 727(a)(4)(A) "provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case.". . . For such a false oath or account to bar a discharge, the false statement must be both material and made with intent.

*Id*. The threshold for materiality is "fairly low". *Id*. "The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id*.

The debtors make two arguments against the plaintiff's claim. They argue "the Debtor's statements to Plaintiff that her debt would be paid in full in bankruptcy are immaterial." The statement reflects only a misunderstanding

of bankruptcy law. Next, they argue the "undisputed facts establish that the Debtors did not act with fraudulent intent." The rental assistance was temporary and was scheduled to stop shortly after they filed their bankruptcy case. They did not know disclosure was necessary. When asked, they admitted they received assistance. They subsequently amended their schedules and disclosed it.

The motion for summary judgment on the § 727 claim is denied for the same reason as the § 523 claim – intent. The debtors' intent is material and disputed. Given the potential cumulative effect of the facts in evidence, the debtors' intent regarding the omission of the rental assistance comes down to credibility. On this record, it is not established for purposes of summary judgment.

## Conclusion

For the above reasons, the defendants' motion for summary judgment is denied.

Dated: March 17, 2026

BY THE COURT:

/s/ Brian S. Kruse

Brian S. Kruse
Bankruptcy Judge