IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK 25-80501 |
| | ) | |
| JAYME DAVIS SELL and ANDRA | ) | |
| LYNNE SELL, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | _____ |
| | ) | |
| CHRISTINA D'SAACHS, | ) | Case No. AP 25-08010 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JAYME DAVIS SELL and ANDRA | ) | |
| LYNNE SELL, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Partially Excepting Debt From Discharge**

The plaintiff Christina D'Saachs filed a complaint seeking to except from discharge under 11 U.S.C. § 523(a)(2)(A) a debt owed by the defendant Jayme Sell. The plaintiff also sought to deny both Jayme and Andra Sell a discharge under 11 U.S.C. § 727. The objection to discharge is denied for the reasons stated on the record after the hearing. The objection to dischargeability is granted in part. Of the total debt owed by the defendant, $9,629 is excepted from discharge because the defendant borrowed the money under false pretenses and under the false representation he intended to repay it.

**Findings of Fact**

The plaintiff met the defendant in a pool hall in Phoenix, Arizona, in February 2022. They immediately started dating. In June 2022, the defendant's stepmother became ill. He decided to return home to Nebraska to be close to his family. He told the plaintiff intended to return to Arizona in the future.

The parties dispute whether their romantic relationship continued after the defendant moved home to Nebraska. According to the defendant the relationship ended. The two were only "close friends." But the defendant acknowledged they intended to resume the romantic relationship after he returned to Arizona.

The plaintiff on the other hand testified the romantic relationship continued through October 2023. The plaintiff established they were more than "close friends" after the defendant left. Several photographs of the plaintiff and the defendant depict the two together. They took a trip to Nashville in September 2022 for the defendant's 40th birthday. They attended a Nebraska football game in November 2022. They traveled to California over Christmas in December 2022 and to Nebraska for New Year's 2023. They celebrated their anniversary together in February 2023. They attended a Dodger baseball game in June 2023. The summer of 2023 they booked an August trip to Cancun. The trip did not occur because the defendant was facing serious criminal charges in Nebraska.

Within a few weeks after they met, the defendant began to discuss his financial condition with the plaintiff. His condition was not on solid footing. The defendant had a significant amount of debt. The defendant wanted to consolidate the debt at a lower interest rate to have only one payment. He texted the plaintiff stating if he could consolidate, he could pay off his debt quickly and become "debt free." He obtained a $60,000 consolidation loan, but it was at a high rate. The defendant texted he wanted to refinance at a lower rate within 30 days.

The parties dispute the origins of the plaintiff's loan to the defendant. According to the defendant, he did not ask to borrow money. In April or May 2022, the plaintiff, out of the blue, offered to refinance her home loan and to loan him the equity. The final loan arrangement was not his idea. It was a "mutual thing." The defendant's testimony was not credible. The defendant's text messages establish the defendant pressed the plaintiff for the loan. For example, on July 20, 2022, the defendant texted the image of a FICO Score of 777 out of 850, which the image called "very good". The defendant followed with, "Man I wished your house could pull equity out and I paid you $1,000 per month for 55 months."

On August 31, 2022, the defendant sent the plaintiff a pay stub, stating he could repay her "with ease." The plaintiff stated her concerns about getting repaid. She questioned his responsibility. He responded, "I have a great hold on finances."

The text messages also establish that the plaintiff was not eager to loan the defendant money. She struggled with his requests. She ultimately relented and loaned the defendant money because she believed the defendant made a commitment they would have a life together. In a series of text messages on September 12, 2022, the plaintiff wrote, "I need to know that you will be committed to this relationship." "If you are not wanting to plan and build for a future together then we are probably wasting our time." "You can't continue to have inappropriate conversations including sending or receiving nudes from other women on snap chat." "[A]nything that was going on with you and anyone else prior to this weekend needs to end." She closed with "Can you commit to all of that?"

The defendant responded, "Yes, that's easy." He added heart and kisses emojis. When asked what the foregoing exchange meant, the defendant described the commitment as only a "business relationship." The two had discussed opening a bar in Arizona sometime in the future. His testimony did not explain the unbusinesslike emojis.

The plaintiff wanted a written agreement. She drafted one titled "Loan Agreement." The agreement listed the purpose of the loan – to allow the defendant to pay two large loans. The defendant asked to revise the agreement to include a third loan. The defendant represented at the time the three loans were the only ones he owed. But at trial the defendant testified he owed other money at the time – the three loans were the "major" debts. He believed he could manage the other debts because they were only a "few thousand" dollars.

On September 22, 2022, the defendant signed the finalized agreement. Under the paragraph titled "Loan Amount," it states, "Christina will be loaning Jayme an amount not to exceed $55,000 for the purpose of repaying three personal loans/debts." It lists the three loans:

> First Debt: BHG LLC $23,500
> Second Debt: LENDING CLUB $26,503.28
> Third Debt: Personal Loan $4600

The $4,600 was added to pay a bank loan the defendant obtained to cover moving and living expenses.

In the Loan Agreement the defendant agreed to bi-monthly payments of at least $1,000 per month. The defendant agreed to employer wage withholding to service the debt. He also agreed to "sign over the title for his truck as soon as it is paid off and (sic) will be held for collateral."

The plaintiff drafted a revised Loan Agreement which is dated January 2, 2023, and the defendant signed it. The original agreement contained a stated maximum loan of $55,000. The revised agreement was necessary because the defendant borrowed more than the stated maximum. The revised agreement increased the "Loan Amount" to $61,751.[1] The revision also corrected the actual payments to the two commercial lenders. The BHG LLC indebtedness increased to $29,446. The LendingClub indebtedness increased to $26,556. The personal loan of $4,600 was removed. It is not clear why. In its place, a different personal loan amount was added in the amount of $5,750. Based upon the debtor's offered deposition testimony, the $5,750 was newly advanced funds.[2]

The defendant made payments on the original and revised agreements through wage withholding. The revised agreement states, "Amount paid as of 12/30 = $3,471.02." But the wage withholding did not last. The defendant was laid off from work on February 24, 2023. He was offered re-employment in June 2023. He declined to return. After he was laid off the defendant made no additional payments toward the plaintiff's loan.

Before he was laid off and unbeknownst to the plaintiff, on December 29, 2022, the defendant applied for a $20,000 loan from SoFi. SoFi funded the loan on January 4, 2023. The defendant testified he did not intend to borrow more money, but life hit him hard. He lost his job. He was also criminally indicted. The veracity of defendant's testimony is questionable. The "hits" the debtor took came after January 2023. He unexpectedly lost his job in February. He was indicted in May. And according to his checking account records he used the funds from the SoFi loan to pay a large undisclosed loan. On January 5, 2023, the day after he obtained the $20,000 SoFi loan, he paid Prosperity Bank $16,919.33.

The defendant continued to borrow money from commercial lenders after December 29. On February 2, 2023, before losing his job and before his criminal indictment, the defendant borrowed another $6,110.65 from Best Egg. On March 28, 2023, he borrowed $13,160 from LendingClub. Unlike the plaintiff's loan, the defendant made regular monthly payments to all these lenders after losing his job, through at least October 2023.

---

[1] The itemized amounts do not equal $61,751. No testimony was offered to explain why.

[2] The defendant testified the $5,750 was not the same as the $4,600 personal loan. He also contended the $5,750 was a gift. The contention is irrelevant as the plaintiff's judgment includes the $5,750 and its status as loaned funds is preclusive.

In mid-October 2023, the plaintiff testified she discovered the defendant was, as she called it, having an affair and lying about it. The defendant had met his now current wife, Andra, in June 2023, and they started dating sometime thereafter. Yet the defendant continued to press the plaintiff for money. On October 16, 2023, the defendant overdrew his checking account. So, he withdrew money from the plaintiff's Chase account without asking. On October 19, 2023, she texted, "Why do you keep withdrawing money from the Chase account. Over four hundred dollars since yesterday. You have literally lost your mind." The defendant responded, "No ma'ma I'm putting it all back in 3 weeks." In total the defendant withdrew $8,000 from the Chase account.

On December 19, 2023, the defendant defaulted on his truck loan. The plaintiff agreed to loan him another $1,629 to prevent repossession. She reasoned if the defendant did not have the truck, he could not work and therefore could not repay her.

On January 2, 2024, the plaintiff revised the agreement a second and final time to include and memorialize the 2023 loan transactions. On January 4, she emailed it to the defendant. The total to be repaid increased to $71,381. The plaintiff added two new loan categories:

> Amount borrowed using Chase Acct since being laid off of 3M in March 2023 - $8,000
> Amount borrowed to avoid repossession of the truck January 2024 - $1,629

The other terms of the agreement largely remained unchanged.

The defendant did not respond to the email and did not physically sign the second revised agreement. The plaintiff texted him the terms. He responded, "Yes agreed."

In February 2024, the plaintiff told the defendant she would not loan him any more money. In response the defendant ghosted the plaintiff and blocked her on social media. The plaintiff tried to communicate with both the defendant and Andra, who was then the defendant's fiancée. On February 4, 2024, Andra texted the plaintiff, "I don't know why you were helping him in the first place he was just using you it was easier that way." Andra testified she was angry because the plaintiff kept contacting the defendant. Her text referred only to her husband's unauthorized use of the Chase card.

For some reason, the defendant's mother-in-law joined in, texting the plaintiff, "But u were not his ex he was stringing u along and [having relations with] andra." The mother-in-law did not testify.

The plaintiff testified she believed the defendant never intended to pay her back. He took advantage of her feelings for him. He never made a good faith effort to get a job despite several opportunities. He misrepresented himself and his willingness to have a relationship with her.

The defendant testified he intended to repay the plaintiff, and he paid her as much as he could. He agreed to wage withholding. He also testified he paid the plaintiff around $4,000 in cash, which the plaintiff disputes. The veracity of defendant's testimony as to the repayment is also questionable. Though his bank records are in evidence, the defendant did not identify specific bank transactions evidencing significant cash withdrawals.

The plaintiff filed a collection action in the County Court of Dodge County, Nebraska, on August 20, 2024, in Case No. CI24-1143. She obtained a judgment and began garnishing the defendant. The defendant filed bankruptcy shortly thereafter.

### Conclusions of Law

The plaintiff seeks to except her judgment debt from discharge. The bankruptcy discharge is the vehicle through which the Bankruptcy Code gives honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The plaintiff asserts her debt should be excepted under 11 U.S.C. § 523(a)(2)(A). Statutory exceptions to discharge are "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Willmar Elec. Servs. Corp. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018).

The exception upon which the plaintiff relies is regarding any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The plaintiff must prove her claim by a preponderance of the evidence. *See Hernandez v. General Mills Fed. Credit Union (In re Hernandez)*, 860 F.3d 591, 601–02 (8th Cir. 2017).

The statute upon which the plaintiff's claim is based includes three different types of fraud – false pretenses, fraudulent representation, and actual fraud. Each is slightly different:

> Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with

the design of perpetrating what is known to be a cheat or deception. The concept of actual or positive fraud consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception.

*Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 790–91 (B.A.P. 8th Cir. 1999) (citations omitted). Actual fraud "can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016).

"A 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression." "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)."

*In re Moen*, 238 B.R. at 791 (citations omitted).

To prevail on a claim of false representation, the plaintiff must establish:

(1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Dailey*, 592 B.R. at 349. A misrepresentation can include "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." *In re Moen*, 238 B.R. at 791. "A debtor's silence regarding a material fact may constitute a false representation actionable under section 523(a)(2)(A)." *Id.*

*Statements Regarding Financial Condition*

The plaintiff did not allege or argue a claim under § 523(a)(2)(B), which excepts certain debts obtained by a materially false written statement respecting the debtor's financial condition. The distinction is important because, "Subsections 523(a)(2)(A) and (B) are mutually exclusive." *Rose v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004); *MarPad, L.L.C. v. Seevers (In re Seevers)*, 574 B.R. 832, 852 n.9 (Bankr. D. Neb. 2017).

Because the plaintiff did not plead a claim under § 523(a)(2)(B), any statement respecting the debtor's financial condition is not actionable in this case. "[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720 (2018). The defendant's written statements about his credit score[3], about the extent, existence, or concealment of his other debts, about his income, and about his general ability to repay are not actionable as fraud in this case as pled because they concern his financial condition.

The plaintiff cannot avoid the financial-condition exclusion by recasting the defendant's nondisclosure of the SoFi loan as actual fraud or a false pretense. A debtor's concealment of his existing debts is a statement respecting his financial condition whether framed as a misrepresentation, a false pretense arising from silence, or actual fraud. As stated above, the Supreme Court in *Husky* held actual fraud "can be effected without a false representation." *Husky*, 578 U.S. at 359. But the "financial condition" exclusion modifies each of the three types of fraud. Because subsections (A) and (B) of § 523(a)(2) are mutually exclusive, *Lauer*, 371 F.3d at 413, a deception respecting the debtor's financial condition is actionable, if at all, only under subsection (B). A creditor cannot re-label a deception as actual fraud or a false pretense to bring it within subsection (A).

### Statements and Pretenses Regarding the Parties' Relationship

In her brief the plaintiff asserts the defendant engaged in fraud through false pretenses concerning their relationship and through false representations about his desire they have a life together. These particulars of fraud were not pled. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "'Circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995) (citation omitted). Specificity is required to allow a defendant to prepare a defense to a charge of fraud. *Id.* The complaint must state the "who, what, when, where, and how surrounding the alleged fraud," but not the "precise

---

[3] Although the defendant testified he probably fabricated the credit score image, records subpoenaed from SoFi Bank state the defendant had an Experian credit score of 761, which appears to be within the 777 range he texted.

details of every instance of fraud." *Barker v. Quicken Loans, LLC*, 537 F. Supp. 3d 1058, 1064 (D. Minn. 2021).

Because the plaintiff now argues the particular of fraud, the question is whether the particular of fraud was tried. "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). The same rule allows a party to move to conform the pleadings to the evidence, which the plaintiff did not do. "But failure to amend does not affect the result of the trial of that issue." *Id.*

Implied consent is raised because the defendant did not object to the admission of evidence of their relationship. "Implied consent exists where a party has actual notice of an unpleaded issue and has been given an adequate opportunity to cure any surprise resulting from the change in the pleadings." *American Fam. Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013) (citations omitted).

Applying *Hollander*, the issue of fraud based upon a pretensive relationship was not tried.[4] The defendant had insufficient notice of the issue and no opportunity to cure. The particular of fraud was not pled. It was not raised in the pretrial statements. It was not raised in an opening statement. It was first raised in the plaintiff's post-trial brief which was submitted contemporaneously with the defendant's brief. In addition, relationship evidence is probative to other issues including justifiable reliance, intent, the disputed origin of the loan, and the defendant's credibility. The failure to object was not, under the totality of the circumstances, consent to the trial of a new unpled particular of fraud.

### *Justifiable Reliance*

The reliance element requires the lesser standard of justifiable reliance, not reasonable reliance. *See Field v. Mans*, 516 U.S. 59, 74–75 (1995). The plaintiff's hesitancy to make the loan makes her insistence on the defendant's commitment a sought-and-given representation. She was justified in relying on it. She was also justified in relying on the defendant's promises throughout all lending transactions. This includes the final truck loan, which

---

[4] Even if the issue was tried, it would not change the outcome of the case. The relationship between the parties did not break down until *after* the revised loan agreement was signed. The evidence strengthens only the conclusion the borrowings after the second revised loan agreement should be excepted from discharge.

the plaintiff deemed necessary because the defendant could not repay her at all if he could not drive to work.

### Fraudulent Intent

The plaintiff must also establish the defendant acted with a fraudulent intent. Establishing intent does not require proof of "malevolence or personal ill-will." *AGP Grain Coop. v. White (In re White)*, 315 B.R. 741, 748 (Bankr. D. Neb. 2004). Direct proof of intent is often impossible to obtain. Therefore, intent may be inferred from probative evidence of the surrounding circumstances. *See Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815 (B.A.P. 8th Cir. 2011). Circumstances include various "badges of fraud." *See First Neb. Bank v. Balfour (In re Balfour)*, 2020 WL 412184, at *9 (Bankr. D. Neb. Jan. 24, 2020) (providing a non-exclusive list of badges of fraud). The cumulative effect of falsehoods evidencing a "pattern of reckless and cavalier disregard for the truth" may support a finding of fraudulent intent. *U.S. Trustee v. Beard (In re Beard)*, 595 B.R. 274, 295 (Bankr. E.D. Ark. 2018). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Universal Bank, N.A. v. Grause (In re Grause)*, 245 B.R. 95, 102 (B.A.P. 8th Cir. 2000).

This case involves multiple borrowings. Section 523(a)(2)(A) applies to a debt but also to an "extension, renewal, or refinancing of credit." Therefore, the debtor's intent at the time of each borrowing event must be separately analyzed along with all other required elements.

### The Original Loan Agreement

The evidence does not establish the plaintiff's claim regarding the initial loan. In her complaint, the plaintiff alleged only three particulars of fraud. She alleged the defendant falsely represented he would provide collateral for the loan. She alleged he falsely represented he would repay the loan. But the primary focus of the plaintiff's complaint, pretrial statement, and trial questioning was the representation the debtor wanted to be, and needed the loan to become, "debt free."

The representation the loan would be collateralized fails because the representation was not false. The source of the representation is the loan agreement. The loan agreement states the debtor would "sign over the title for his truck *as soon as it is paid off* and will be held for collateral." The truck was never paid off. It was totaled in a collision. The obligation to "sign over the title" as collateral was never triggered.

The "debt free" statements are not actionable in this case because assuming them to be false statements of fact, they concern his financial condition. They are not actionable under § 523(a)(2)(A). The allegedly fraudulent nature of the "debt free statements" require the court to consider other "statements" about his financial condition including his concealment of the SoFi loan.

Even if the "debt free" statements were actionable, the plaintiff did not establish fraud. Becoming "debt free" was the debtor's aspiration or motivation. It was not a factual representation he would never have debt again. Moreover, the statement was accurate. Obtaining a consolidation loan at lesser rates would allow him to service and pay off the debt faster than having separate high interest loans.

The plaintiff also did not establish the defendant did not intend to repay the original loan. The timing is crucial. Representations of fact "must relate to a present or past fact." *In re Dailey*, 592 B.R. at 350. A promise to pay is a promise of future performance. Such a promise can support a claim under § 523(a)(2)(A) if it was "made with the intent to defraud and without the intent to perform." *Id*. For example if the "debtor possesses no intent to perform the act at the time the debtor's promise is made." *Id*. On the other hand, "A promise to pay a debt in the future is not a misrepresentation merely because the debtor fails to do so." *Id*.

The debtor evidenced an intent to pay the original loan when it was made because he made several payments. *See, e.g., Clauss v. Church (In re Church)*, 328 B.R. 544, 547–48 (B.A.P. 8th Cir. 2005) (approving the bankruptcy court finding the debtor had an intent to repay when the defendant paid 15 monthly payments). The defendant was employed when he borrowed the money. He made payments for several months, through February 2023. By January 2, 2023, he had repaid $3,471.02. The plaintiff asserts the payments were not voluntary because they were through wage withholding. The argument ignores the defendant voluntarily set up the wage withholding. He did not terminate the withholding. The withholding payments stopped because he lost his job.

### *The Revised Loan Agreements*

The plaintiff's claims regarding intent to repay the revised agreement also fail. The revised agreement was signed three months after the original. When the defendant signed it, he was employed and was still making payments. As with the original agreement, this supports at the time he signed the revised agreement he intended to repay the loan.

Causation is also lacking. Section 523(a)(2)(A) applies only to a debt, extension, renewal, or refinancing "obtained by" fraud. The words "obtained by" require a showing of causation. *See Field v. Mans*, 516 U.S. 59, 66 (1995) (noting an "element of causation" in the phrase "obtained by"). The revised agreement was a papering of past transactions. The plaintiff testified the revised agreement was created to correct the amounts *already loaned* in the original agreement. Additional amounts were included, but they also were already loaned.

The second revised agreement requires separate treatment. Unlike the first, it memorializes advances for which, as analyzed below, the debtor had no intention to repay. But the signing of the second revised agreement is not the operative transaction for causation purposes. The "obtained by" inquiry is determined when the money was advanced, not when the debt was later papered. When the defendant replied, "Yes agreed" to the text about the second revised agreement, the plaintiff parted with nothing and forbore nothing. Her loss was sustained earlier, at the time of each individual advance. Under *In re Dailey*, the dischargeability of those advances is therefore determined not by the second revised agreement but by the circumstances of each individual borrowing. *See In re Dailey*, 592 B.R. at 349.

### *Other Borrowings*

The plaintiff established the defendant did not intend to repay the $8,000 he withdrew from the plaintiff's Chase account[5] after March 2023 and the $1,629 the plaintiff advanced to pay the defendant's truck loan. These funds were obtained by the false pretense and representation that the defendant intended to repay. The surrounding facts and circumstances, and the cumulative falsehoods establish the defendant's fraudulent intent. He stopped paying loan payments to the plaintiff in February 2023. He paid every lender except the plaintiff. Through October 2023, he was actively paying SoFi, Best Egg, and LendingClub.[6] He promised to repay a portion of the Chase borrowings "all back in 3 weeks," but he had no means to do so. The defendant's wife and mother-in-law also stated the defendant's intent –

---

[5] Some of the Chase withdrawals were made without the plaintiff's express approval and could also support a claim for embezzlement or larceny under 11 U.S.C. § 523(a)(4), which was not pled. But that does not remove the conduct from § 523(a)(2)(A).

[6] The concealed SoFi loan does not support a claim under § 523(a)(2)(A), but it remains relevant as a badge of fraud bearing on the defendant's intent as to these later borrowings.

he was using the plaintiff. By this time, he clearly viewed the plaintiff as a source of money which he could avoid repaying indefinitely.

## Conclusion

The judgment entered in favor of the plaintiff Christina D'Saachs and against the defendant Jayme Davis Sell by the County Court of Dodge County, Nebraska on August 20, 2024, in Case No. CI24-1143 is partially excepted from discharge under 11 U.S.C. § 523(a)(2)(A) in the principal amount of $9,629. All pre-judgment and post-judgment interest on this amount is also excepted from discharge.

Dated: June 2, 2026

BY THE COURT

/s/ Brian S. Kruse

Brian S. Kruse
Bankruptcy Judge